**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

KEVIN COBBINS,

    Plaintiff,

    v.

JONATHAN GRAHAM,                   Case No. 21-155
CHRISTOPHER SOLLIE, CALEB MOTT,
CHRISTOPHER SHAW, BRIAN HARKINS,
SCOTT GLENN, DANIEL EDWARDS,
KEVIN REEVES, JOHN RILES,
MARK RICHARDS, LEN MARIE, AND
SCOTT DAVIS,

    Defendants.

# <u>COMPLAINT</u>

## INTRODUCTION

1.    This is one of the too-frequent instances of unwarranted brutality against a Black man stopped on the roads of Louisiana. Kevin Cobbins was approaching the Wardline/University exit of Interstate 55, on his way home to his family in Hammond after a late shift at the restaurant in New Orleans where he worked. Seeing the blue lights of a police vehicle turn on behind him, Cobbins completed his exit, brought his car to a stop, and turned the engine off. He was immediately surrounded by five Tangipahoa Parish Sheriff's Officers and a Louisiana State Police Trooper with their weapons drawn, shouting.

2.    Cobbins threw the keys out of his recently-rented car, as ordered, trying to raise his hands while also remembering how to get his unfamiliar car door open. The officers grabbed and pulled Cobbins from the car, his shirt ripped open as he was thrown to the ground and pinned there.

One of the officers struck Cobbins in his torso with a closed fist. Cobbins continued to ask the officers what he had done wrong. Then Cobbins screamed as he felt the electric shock of a Taser applied directly to his lower back. Ultimately, Cobbins was handcuffed, pulled forcibly off the ground, dragged to a patrol car, and pushed in, with the door closed on his leg for good measure. During this scene, the officers smiled and laughed, telling Cobbins, "it's called not following directions."

3.      The officer who pulled Cobbins over (and who struck Cobbins while he was pinned to the ground) was Officer Jonathan Graham of the Tangipahoa Parish Sheriff's Office (TPSO). The other officers with their weapons drawn who also ripped Cobbins out of the car and threw him on the ground were fellow TPSO Officers Caleb Mott, Christopher Shaw, Brian Harkins, and Scott Glenn. The officer who assaulted Cobbins with the Taser was Louisiana State Police Trooper Christopher Sollie.

4.      These six law enforcement officers, however, were not the only ones connected to Kevin Cobbins' assault. Trooper Sollie was trained in the use of force (UOF) by Mark Richards, Len Marie, and Scott Davis of the Louisiana State Police (LSP). LSP's "training" gave permission to troopers like Sollie to escalate the attack by the use of his Taser, even after Cobbins was pinned to the ground and unable to escape custody. That training was consistent with the brutal culture of the LSP Training Academy run by Richards, Marie, and Davis, which affirmed the use of excessive force to cause unnecessary pain and injury without concern for the effect on the person being stopped. Then-Superintendent Kevin Reeves condoned this culture, which would ultimately require his resignation after a pursuit of a Black driver in North Louisiana ended with the driver's beating, tasing, and death. Captain John Riles, the commander of Troop L, had not counseled or disciplined Sollie about the multiple Use of Force Reports submitted by the trooper, all involving

Black men, and most of whom were, like Cobbins, stopped on minor infractions. Likewise, the TPSO Officers were effectively unsupervised by Sheriff Daniel Edwards, who failed to provide policies or training about the constitutional requirement of justified, reasonable, and proportional force, or the duty of officers to stop brutality inflicted by other officers in their presence.

5.      This lawsuit is filed to seek compensation for Kevin Cobbins for the physical, emotional, and psychological agony that was caused by that early morning traffic stop. It is also filed to seek accountability from the law enforcement officers who assaulted Kevin Cobbins and the superior officers who trained them to do so. The epidemic of police violence against Black motorists will not stop until law enforcement officers like these Defendants are made to answer for the damage caused by their deliberate indifference to the pain and injury inflicted by their grossly excessive force against drivers detained for mere moving violations.

6.      This action seeks redress for the violations of the rights guaranteed to Cobbins by the Fourth and Fourteenth Amendments to the United States Constitution, as well as violations of state law by the named Defendants. Cobbins, by and through his attorneys, seeks all relief as detailed throughout this complaint and as requested below.

## NATURE OF THE ACTION

7.      Cobbins brings this action under 42 U.S.C. § 1983 for deprivation of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

8.      Cobbins also seeks redress of the assault, battery, and intentional infliction of emotional distress perpetrated on him by Defendants, pursuant to LA. CODE CIV. PROC. art. 2315.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's claims for violations of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343. This

Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as the state law claims are so related to Plaintiff's federal claims as to form part of the same case or controversy.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1). All Defendants reside in the State of Louisiana, and Defendants Harkins, Glenn, and Davis reside in the Middle District of Louisiana.

## PARTIES

11.     Plaintiff Kevin Cobbins is a resident of St. Tammany Parish, Louisiana. Cobbins was subjected to excessive force by officers of the Tangipahoa Parish Sheriff's Office (TPSO) and the Louisiana State Police (LSP).

12.     Jonathan Graham is an officer with the Tangipahoa Parish Sheriff's Office. He is a person of the full age of majority and a resident of Tangipahoa Parish, Louisiana. Graham is sued in his individual capacity. Graham used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by other members of the TPSO and LSP. At all times described herein, Graham was acting under color of law and in the course and scope of his employment.

13.     Christopher Sollie is an officer with the Louisiana State Police. He is a person of the full age of majority and a resident of St. Tammany Parish, Louisiana. Sollie is sued in his individual capacity. Sollie used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by members of the TPSO. At all times described herein, Sollie was acting under color of law and in the course and scope of his employment.

14.     Caleb Mott is an officer with the Tangipahoa Parish Sheriff's Office. He is a person of the full age of majority and a resident of Terrebonne Parish, Louisiana. Mott is sued in his

individual capacity. Mott used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by other members of the TPSO and LSP. At all times described herein, Mott was acting under color of law and in the course and scope of his employment.

15.    Christopher Shaw is an officer with the Tangipahoa Parish Sheriff's Office. He is a person of the full age of majority and a resident of Tangipahoa Parish, Louisiana. Shaw is sued in his individual capacity. Shaw used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by other members of the TPSO and LSP. At all times described herein, Shaw was acting under color of law and in the course and scope of his employment.

16.    Brian Harkins is an officer with the Tangipahoa Parish Sheriff's Office. He is a person of the full age of majority and a resident of Livingston Parish, Louisiana. Harkins is sued in his individual capacity. Harkins used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by other members of the TPSO and LSP. At all times described herein, Harkins was acting under color of law and in the course and scope of his employment.

17.    Scott Glenn is an officer with the Tangipahoa Parish Sheriff's Office. He is a person of the full age of majority and a resident of Livingston Parish, Louisiana. Glenn is sued in his individual capacity. Glenn used excessive force against Kevin Cobbins and failed to intervene in excessive force against Cobbins by other members of the TPSO and LSP. At all times described herein, Glenn was acting under color of law and in the course and scope of his employment.

18.    Daniel Edwards is the Sheriff of Tangipahoa Parish, Louisiana. Edwards was sworn in as Sheriff in July 2004, and was re-elected to his fifth term in 2019. He is a person of the full age of majority and a resident of Tangipahoa Parish, Louisiana. Edwards is sued in his individual and official capacities. At all times described herein, Edwards was responsible for the hiring,

training, supervision, discipline, and control of staff to carry out the functions of the Tangipahoa

Parish Sheriff's Office. He was also responsible for the administration, policies, practices,

customs, usages, and operations of the TPSO. He was and is a final policymaker. At all times

described herein, Edwards was acting under color of law and in the course and scope of his

employment. He is liable both directly (on all claims) and vicariously (on all claims arising under

Louisiana law) for the actions complained of herein.

19.    Kevin Reeves was the Superintendent for the Louisiana State Police. He was

appointed Superintendent in May 2017 and retired from the LSP in October 2020. Reeves'

retirement coincided with recent reports of misconduct by troopers under his command, including

the death of Ronald Greene, a Black man who died while in State Police custody in May 2019.

Reeves is a person of the full age of majority and a resident of Jackson Parish, Louisiana. He is

sued in his individual capacity. At all times described herein, Reeves was responsible for the hiring,

training, supervision, discipline, and control of staff to carry out the functions of the Louisiana

State Police. He was also responsible for the administration, policies, practices, customs, usages,

and operations of the LSP. He was a final policymaker. At all times described herein, Reeves was

acting under color of law and in the course and scope of his employment. He is liable both directly

(on all claims) and vicariously (on all claims arising from Louisiana law) for the actions

complained of herein.

20.    John Riles is a Major with the Louisiana State Police and was Commander of LSP

Troop L from April 2017 until August 2020. He is a person of the full age of majority and a resident

of Washington Parish, Louisiana. Riles is sued in his individual capacity. At all times described

herein, Riles was responsible for the hiring, training, supervision, discipline, and control of staff

to carry out the functions of the Louisiana State Police, Troop L. He was also responsible for the

administration, policies, practices, customs, usages, and operations of the LSP, Troop L. He was a final policymaker. At all times described herein, Riles was acting under color of law and in the course and scope of his employment. He is liable both directly (on all claims) and vicariously (on all claims arising under Louisiana law) for the actions complained of herein.

21.    Mark Richards was a Captain with the Louisiana State Police, retiring from LSP in December 2020. From February 2018 until May 2020, he served as the Director of Training for LSP. Richards is a person of the full age of majority and a resident of Livingston Parish, Louisiana. Richards is sued in his individual capacity. At all times described herein, Richards had operational authority over the Louisiana State Police Training Academy, and was responsible for cadet training, in-service training, and other agency training. Richards was responsible for the hiring, training, supervision, discipline, and control of staff to carry out the functions of the LSP Training Academy. He was also responsible for the administration, policies, practices, customs, usages, and operations of the LSP Training Academy. Richards was a final policymaker. At all times described herein, Richards was acting under color of law and in the course and scope of his employment. He is liable both directly (on all claims) and vicariously (on all claims arising under Louisiana law) for the actions complained of herein.

22.    Len Marie is a Sergeant with the Louisiana State Police. From 2018 until late 2019 or early 2020, he was a Lieutenant with LSP and the Training Operations Supervisor responsible for all in-service training, cadet training, and coordination of outside agency in-service or training. In late 2019 or early 2020, Marie was demoted from the rank of lieutenant to sergeant after an internal investigation in the Fall of 2019 concluded that training exercises during LSP's academy caused significant injuries to cadets involved. Marie had been transferred out of the LSP's training division in October 2019. Marie is a person of the full age of majority and a resident of Ascension

Parish, Louisiana. Marie is sued in his individual capacity. As Training Operations Supervisor, Marie was responsible for the hiring, training, supervision, discipline, and control of staff under his command. He was also responsible for the administration, policies, practices, customs, usages, and operations of LSP Training Operations. Marie was a final policymaker. At all times described herein, Marie was acting under color of law and in the course and scope of his employment. He is liable both directly (on all claims) and vicariously (on all claims arising under Louisiana law) for the actions complained of herein.

23.     Scott Davis is a Sergeant with the Louisiana State Police, the In-Service Training Coordinator, and a member of the Training Academy responsible for all Use of Force training and instruction as well as review of all Use of Force Reports. Davis is a person of the full age of majority and a resident of East Baton Rouge Parish, Louisiana. Davis is sued in his individual capacity. As In-Service Training Coordinator and Use of Force instructor, Davis is responsible for hiring, training, supervision, discipline, and control of staff under his command. He is also responsible for the administration, policies, practices, customs, usages, and operations of the LSP related to in-service training and use of force instruction. Davis is a defensive tactics instructor, OC spray instructor, a TASER master instructor, a drive instructor, and a range safety officer for LSP. Davis is a final policymaker. At all times described herein, Davis was acting under color of law and in the course and scope of his employment. He is liable both directly (on all claims) and vicariously (on all claims arising under Louisiana law) for the actions complained of herein.

## FACTUAL BACKGROUND

**I.      Excessive Force Against Kevin Cobbins and Failure to Intervene**

24.      Plaintiff incorporates by reference the allegations previously set forth in this complaint.

25.      In the early morning hours of March 12, 2020, Kevin Cobbins was driving to his home in Hammond, Louisiana, after completing his shift at a New Orleans restaurant.

26.      While traveling north on Interstate 55, Cobbins approached his exit, Wardline Road/University Avenue.

27.      At this time, Cobbins noticed a vehicle close behind him. Shortly after, the vehicle activated its lights and siren.

28.      With knowledge that recently his pastor had been struck and killed after stopping in an unsafe position on the highway, Cobbins took his exit, came to a complete stop at the end of the ramp, and turned the car off.

29.      The TPSO vehicle that had originally pulled behind Cobbins on the interstate came to a stop behind Cobbins' car. This SUV bore the vehicle number 2001.

30.      At least three other law enforcement vehicles were already present or arrived at the site of Cobbins' stopped car: (1) TPSO vehicle number 1708 also pulled behind Cobbins at the end of the exit ramp; another TPSO vehicle was stopped on University Avenue at the exit ramp signal; and a Louisiana State Police vehicle, driven by Trooper Christopher Sollie, also arrived and stopped on University Avenue at the exit ramp signal.

31.      Before responding to the scene, Sollie had been located off Wardline Road/University Avenue, on the west side of Interstate 55. Upon information and belief, Sollie received radio communication which precipitated his arrival at the scene.

9

32.     As instructed by the officers, after stopping his car and turning it off, Cobbins threw his car keys out of the window and raised his hands.

33.     Six officers – TPSO Officers Graham, Mott, Shaw, Harkins, and Glenn, along with LSP Trooper Sollie – all advanced on Cobbins' car with their weapons drawn.

34.     At this time, the TPSO Officers and LSP Trooper Sollie believed only that Cobbins had violated La. R.S. § 32:79, "driving on a roadway laned for traffic," and that Cobbins had done so while traveling under the speed limit. This is a civil traffic violation with no associated criminal penalties under Louisiana law. Thus, Cobbins was not suspected of committing a crime. Following this incident, the bill of information filed against Cobbins on April 29, 2020 would allege that Cobbins, "being a driver of a vehicle upon a roadway designated for one-way traffic, did fail to drive said vehicle as nearly as practicable entirely within a single lane and did move from such lane before ascertaining that such movement could be made with safety."

35.     The TPSO Officers and LSP Trooper Sollie had no reason to believe that Cobbins posed a threat to them or to anyone else. Cobbins was not armed. No weapon was found on his person or in his car.

36.     Two TPSO Officers – Graham and Mott, Shaw, Harkins, or Glenn – approached Cobbins' car from the rear. Graham opened Cobbins' driver's door, while Mott, Shaw, Harkins, or Glenn opened the front passenger door. Graham grabbed Cobbins as Cobbins sat in the driver's seat.

37.     As Officer Mott, Shaw, Harkins, or Glenn then moved around the rear of Cobbins' car, toward the driver's door, the other three TPSO Defendant Officers, along with LSP Trooper Sollie, approached from the northwest, also convening on Cobbins' driver's door.

38.     Immediately, TPSO Officers Mott, Shaw, and Glenn joined Graham in grabbing Cobbins. Simultaneously, TPSO Officer Harkins moved around the front of Cobbins' car, entering the front passenger door to push Cobbins out of the driver's door.

39.     As the TPSO Officers grabbed and pushed Cobbins, Cobbins yelled that he was still secured in his seatbelt, and repeatedly asked what he was accused of doing. Cobbins received no response from any officer.

40.     With Cobbins still located in his car, while the TPSO Officers grabbed and pushed, LSP Trooper Sollie stated, "I'll tase him. I'll tase him." Sollie was located behind the TPSO Officers who had crowded Cobbins' driver's door, with Sollie's view of Cobbins obstructed.

41.     Sollie did not deploy his Taser at this time. Instead, TPSO Officers Graham, Mott, Shaw, and Glenn succeeded in snatching Cobbins from the car and throwing him on the pavement.

42.     With Cobbins facedown, TPSO Officers Graham, Mott, Shaw, and Glenn swarmed around and on top of Cobbins, pinning him to the ground. Some of the officers instructed Cobbins to put his hands behind his back. Although Cobbins did not immediately put his hands behind his back, Cobbins lacked any means of evading the officers' custody.

43.     Cobbins continued to ask repeatedly what he had done wrong. He continued to receive no response from any officer.

44.     While Cobbins was pinned to the ground, with TPSO Officer Graham straddling Cobbins' legs with Graham's weight on Cobbins' lower back and rear, Graham punched Cobbins in the lower torso.

45.     LSP Trooper Sollie stood over and immediately next to where Cobbins lay pinned to the ground by the TPSO Officers. Sollie stated, "Taser. Taser. Watch out. Taser."

46.     As TPSO Officers lifted Cobbins' shirt to expose his skin, Sollie thrust his Taser into Cobbins' lower back in a stun drive, placing the Taser in direct contact with Cobbins' flesh as the electric current was discharged.

47.     As the stun drive was applied, Cobbins yelled out in pain, then whimpered as the electric current stopped.

48.     Cobbins' hands were then placed behind his back and he was handcuffed.

49.     TPSO Officer Harkins joined the other TPSO Officers in restraining Cobbins.

50.     LSP Trooper Sollie radioed regarding the "traffic stop," providing the location of the incident and reporting "Taser deployed, Code 4."

51.     While handcuffed on the ground, Cobbins continued to plead, "what did I do?" In response, TPSO Officer Graham retorted: "It's called not listening."

52.     Cobbins continued to state that he had just gotten off from work, that the car was unfamiliar to him as it was a rental, that he had previously suffered a back injury, and that the officers had punched him in the back.

53.     With Cobbins still restrained on the ground, TPSO Officer Harkins began to shine a flashlight into the Cobbins' car through the open driver's door. TPSO Officer Graham went around to the front passenger door with TPSO Officer Mott, Shaw, and/or Glenn and began to search through Cobbins' car.

54.     The TPSO Officers and LSP Trooper Sollie continued to search Cobbins' car, opening the rear doors as well as the trunk. Upon information and belief, during this search, items were removed from the car. Some of these items were not recorded or logged by the law enforcement officers, nor returned to Cobbins.

55.     While Cobbins remained handcuffed on the ground, stating "y'all beat me up," TPSO Officer Graham, Mott, Shaw, Harkins, or Glenn began to recite the Miranda warning. When the officer completed his recitation, he asked Cobbins, "Do you understand?" Cobbins replied, "No, I don't understand." No officer stated that Cobbins was under arrest or that he was being charged with any crime.

56.     TPSO Officer Graham then grabbed Cobbins by his right arm and forcibly pulled him off the ground. Cobbins had repeatedly indicated that he had received treatment for a prior back injury, and that during this encounter he had been punched in the back and "beat up." As TPSO Officer Graham and TPSO Officer Mott, Shaw, Harkins, or Glenn continue to pull on Cobbins' arms and tell him to stand up, Cobbins stated "I can't," and continued to complain of his back.

57.     TPSO Officer Graham and TPSO Officer Mott, Shaw, Harkins, or Glenn than dragged Cobbins across the pavement to TPSO vehicle number 1708. Cobbins cried, "Oh, wow," and yelled out in pain. As this occurred, two TPSO Officers – Mott, Shaw, Harkins, or Glenn – smiled and laughed.

58.     Cobbins was placed in the back seat of the TPSO vehicle, with his leg still outside the vehicle. The TPSO Officers started to close the vehicle door on Cobbins' leg. Cobbins cried out again in pain.

59.     Cobbins asked the officers for their names and badge numbers, but they were not provided.

60.     At this time, LSP Trooper Sollie turned off the audio recording on his body-worn camera.

61.     Cobbins was not searched before being placed into the TPSO vehicle.

62.     Several minutes later, TPSO Officer Graham asked Cobbins to exit the vehicle. Cobbins agreed to do so, provided he be taken to a location recorded by camera. Cobbins walked slowly and gingerly back toward the driver's door of his rental car, in view of the dash camera on Trooper Sollie's vehicle. Cobbins' chest and back were naked, his long-sleeved, button-down shirt and over-jacket hanging from where his hands remained cuffed behind his back; his shirt had been torn open in the front when the TPSO Officers snatched him from the car and threw him to the ground.

63.     TPSO Officers Graham, Mott, Shaw, Harkins, and/or Glenn conducted a search of Cobbins' person and clothing. No weapons or illegal items were discovered during this search. Cobbins was escorted back to TPSO vehicle number 1708.

64.     At multiple times during this incident, the TPSO Officers smiled and laughed.

65.     Cobbins was transported by TPSO Officer Mott to Lallie Kemp Regional Medical Center in Independence, Louisiana, for medical evaluation and treatment. The medical center staff took Cobbins' vitals, evaluated his body for injury, and performed x-rays.

66.     Cobbins was subsequently brought to the Tangipahoa Parish jail and booked into custody. Cobbins remained in jail for approximately one day before his family posted his bond.

67.     Cobbins experienced extreme physical pain and emotional distress as a result of the excessive force and failure to intervene by Graham, Sollie, Mott, Shaw, Harkins, and Glenn. Cobbins suffered sores to his wrists, abrasions, swelling and bruising to his back, bruising to the interior of his arms, and bruising to his knees during the excessive force and failure to intervene. Cobbins' physical pain and emotional distress continues to this day.

68.     Following this incident, Cobbins filed a complaint with the Tangipahoa Parish Sheriff's Office regarding his treatment by the TPSO Officers and by LSP Trooper Sollie. Sheriff

Edwards informed Cobbins that Edwards would "make sure" that Cobbins' complaint would be "investigated properly." Cobbins also contacted LSP and attempted to file a complaint regarding the incident, but he was told that he would not be able to due to COVID-19 restrictions.

69.     On April 29, 2020, the District Attorney for the 21st Judicial District charged Cobbins with three counts related to this incident: (1) R.S. 32:79, improper lane usage; (2) R.S. 14:108, resisting an officer; and (3) R.S. 40:966(C) & (E), possession of marijuana. The TPSO incident report stated that, after Cobbins had been transported to the hospital, Officer Graham had "approached the vehicle [Cobbins' car] to conduct an inventory for tow, at which time [Graham] noticed the odor of un burned marijuana," and that "suspected marijuana" was located.

70.     The Office of the District Attorney has offered to drop all criminal charges against Cobbins in exchange for Cobbins' agreement not to pursue litigation for the violations of his civil rights.

## II.     The Policy, Training, and Supervision Failures of Richards, Marie, Davis, and Riles Resulted in Excessive Force Against Cobbins and Failure to Intervene.

### A.     Introduction

71.     In their respective work assignments to the Louisiana State Police Training Academy, Richards, Marie, and Davis were responsible for educating and training individual troopers in (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

72.     In his capacity as Training Academy Director, Richards was responsible for the supervision, administration, policies, practices, and customs of the LSP Training Academy and in-service training program. Richards was responsible for training LSP cadets as well as for providing

continuing training for LSP troopers. In particular, Richards was responsible for the content of LSP training modules, including but not limited to the use of force, the use of Conducted Electrical Weapons ("CEW") such as the Taser, and the duties and responsibilities of troopers responding to a call for service.

73.     Additionally, as Director of the Training Academy, Richards was responsible for the review of all UOF reports from any LSP trooper or officer to ensure that the conduct reported in such reports was consistent with LSP policy, and to notify the commander of the troop to which the reporting trooper belonged whether the Training Academy believed that the reporting trooper required remedial training and/or discipline.

74.     In his capacity as Training Operations Supervisor, Marie was responsible for all in-service training, cadet training, and coordination of any outside agency in-service training. Marie reported to Richards. In particular, Marie was responsible for the content of LSP training modules, including but not limited to the use of force, the use of Conducted Electrical Weapons ("CEW") such as the Taser, and the duties and responsibilities of troopers responding to a call for service.

75.     In his capacity as In-Service Training Coordinator, Use of Force Instructor, Certified Taser Instructor, and a staff member of the LSP Training Academy, Davis was responsible for all Use of Force training and instruction as well as review of all UOF reports. Davis personally presented UOF training modules, including but limited to the Taser certification course and the Integrated Use of Force Management course. Davis reported to Marie; however, Davis' review of UOF reports was submitted directly to Richards for further review and approval.

76.     In his capacity as commander of LSP Troop L, Riles was responsible for the supervision, training, discipline, and if necessary re-training of the troopers assigned to Troop L, including Sollie, as to (a) the limits on their uses of force imposed by the Fourth and Fourteenth

Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

77.    Richards, Marie, and Davis failed to train troopers on (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

78.    Instead, Richards, Marie, and Davis trained new cadets and in-service troopers to ignore these constitutional limits, to inflict pain from excessive force on civilians such as Kevin Cobbins, and to conceal the use of excessive force by other law enforcement officers that the cadets and/or troopers had witnessed.

79.    Riles failed to train and supervise the troopers under his command to adhere to the constitutional limits on the use of force by law enforcement officers. Riles also failed to train and supervise the troopers under his command to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

80.    In the course of their failures to train and supervise, Defendants disregarded the known or obvious consequences of the above-mentioned deficiencies in policies, training, and supervision, specifically including the known or obvious consequences:

      a.    That a trooper such as Sollie would use his Taser on Kevin Cobbins under the circumstances presented to Sollie on March 12, 2020;

b.  That a trooper such as Sollie would fail to intervene to stop the uses of force employed by Graham, Mott, Shaw, Harkins, and/or Glenn against Kevin Cobbins, which he saw and which he knew or should have known constituted excessive force in violation of the Fourth and Fourteenth Amendments; and

c.  That a trooper such as Sollie would instead acquiesce in the excessive uses of force visited upon Kevin Cobbins by Graham, Mott, Shaw, Harkins, and/or Glenn.

**B.    Richards, Marie and Davis Trained Troopers to Inflict Excessive Force on Civilians Without Regard for the Amount of Pain and/or Injury Caused by Such Force and Without Regard to the Necessity or Reasonableness of the Force.**

81.    In October 2019, allegations surfaced that LSP cadets attending the LSP Training Academy were required to physically abuse each other. This abuse included forcing cadets to hit one another with hard objects wrapped in "training pads," sleep deprivation over consecutive nights, and forcing cadets to swim distances long enough to present a health and safety risk.

82.    Marie, among others, directed the infliction of this abuse during trainings related to use of force and defensive tactics. Marie also personally assaulted the cadets.

83.    In connection with the sleep deprivation, a cadet alleged that they "were kept in one room with the lights on and the air conditioning turned as low as it would go," and that "every hour, someone would walk in and order all the cadets to stand up and walk around the room."

84.    The training pads used to carry out Marie's training in inflicting violence were found to be stained with blood from the assaults on the trainees. These pads seemed to have a hard substance in them; cadets who suffered the training described them as feeling "like concrete," a "brick," a "baseball," or a "metal rod." Marie himself admitted to a fellow trooper that the pads were "like getting hit by bricks." Another trooper said Marie told him he had struck a cadet so hard

18

that the pad "wrapped around the cadet's arm," the report said. The trooper said Marie "was proud and seemed to be bragging about it."

85.    Almost all of the 55 cadets in the 2019 training class had some level of bruising from the "training." A nurse who treated the cadets said they resembled victims of domestic abuse and motor vehicle crashes. A fellow cadet described a trainee as so badly bruised, he looked like he had a full body tattoo from his waist to his collarbone. Another cadet reported that Marie hit him so hard in the back of the neck with a pad that he was knocked unconscious. A nurse later diagnosed that same cadet as suffering post-concussion symptoms.

86.    Marie, who entered LSP as a cadet in August 2002, had been the victim of the same training in inflicting pain and injury. He told a fellow instructor that he had been bruised during his academy training, and "now it's their turn."

87.    Up to a dozen cadets showed up at area hospitals and clinics with injuries they allegedly received during the 2019 training academy class, including bruises and contusions as well as a broken nose and arm. In one case, clinic staff believed that the deep bruising in a cadet who presented to them for treatment could lead him to needing surgery for Compartment Syndrome, a rare medical condition that occurs when pressure within the muscles builds to dangerous levels.

88.    The lessons taught in this training include the following:

    a.    It is permissible for a trooper to inflict serious pain and/or injury on another individual who has done nothing to justify such pain and/or injury;

    b.    A trooper who commits or witnesses another trooper commit, serious, unjustified physical abuse of another individual must ignore the injuries, pain, and cries of the victim of that abuse;

    c.   No trooper should intervene to prevent or stop the infliction of unnecessary, extreme physical pain and/or injury which that trooper witnessed another trooper inflict; and

    d.   No trooper should report the infliction of unnecessary, extreme physical pain and/or injury which that trooper witnessed another trooper commit.

89.    Although it was widely known both within the LSP Training Academy and among other troopers, the abuse of trainees under Marie was only investigated after news organizations in Baton Rouge reported about it in October 2019 and thereafter. Thus, Reeves, Richards, and Davis knew, turned a blind eye toward, and possibly themselves participated, in this abuse.

90.    After the news reports, an LSP internal investigation found that the injuries went beyond "normal parameters" for the Academy's defensive tactics training program.

91.    As a result of the investigation, Marie was demoted from Lieutenant to Sergeant and transferred out of his Academy duties. The defensive tactics program was suspended.

92.    The culture exposed by the 2019 discovery demonstrates issues which impact more than that one training program. Marie was also responsible, along with Richards and Davis, for in-service training of troopers in use of force and defensive tactics. The culture of brutality, violence, and silence inculcated in the cadet training program was also a feature of the in-service training of troopers such as Sollie to disregard the constitutional rights of civilians such as Kevin Cobbins to be free from excessive force during a traffic stop.

93.    As Marie admitted, this culture of brutality has existed at the LSP Training Academy since at least August 2002, when Marie himself was a cadet. Therefore, Sollie, who attended the academy several years after Marie did, must have also witnessed, suffered, and/or committed this same form of abuse during his initial training.

94.    It was obvious that, as a likely consequence of the affirmative training of troopers by Richards, Marie, and Davis to inflict pain on civilians without regard to the necessity or reasonableness of the force used, troopers such as Sollie would violate the constitutional rights of civilians such as Kevin Cobbins.

95.    It was also obvious that, as a likely consequence of the affirmative training of troopers by Richards, Marie, and Davis to ignore the extent of injury and pain inflicted on a civilian by a trooper, that troopers such as Sollie would acquiesce, and/or fail to intervene, to stop other law enforcement officers from inflicting excessive force on civilians such as Kevin Cobbins.

**C.    Richards, Marie, and Davis Failed to Train Troopers on the Appropriate Use of Force Against a Civilian.**

96.    In addition to the culture of brutality, violence, and silence that was inculcated into new cadets and current troopers by Defendants Richard, Marie, and Davis, these three Defendants also failed to train troopers such as Defendant Sollie in the appropriate use of force to inflict upon a civilian.

97.    As of March 12, 2020, the clearly established interpretation of the Fourth and Fourteenth Amendments by the U.S. Court of Appeals for the Fifth Circuit required:

     a.    that a law enforcement officer can only use that amount or degree of force that is necessary, reasonable, and proportional to the circumstances;

     b.    that the level of force must be proportionately reduced where a civilian lacks any means of evading custody, including, for example, when the civilian is pinned to the ground by other officers; and

     c.    that even where a civilian who is pinned down by law enforcement officers is failing to comply with the officers' directions, and/or struggling against the officers at certain points during the encounter, the use of force may not be escalated.

21

98.     Richards, Marie, and Davis failed to teach these principles to cadets or in-service troopers.

99.     Instead, the use of force training, including Taser training, given to cadets and in-service troopers by Richards, Marie, and Davis stressed the use of the trooper's personal, subjective judgment.

100.    It was obvious that, as a likely consequence of the failure by Defendants Richards, Marie, and Davis to train in-service troopers on the constitutional requirement to use only that amount or degree of force that is necessary, reasonable, and proportional to the circumstances, and to reduce the amount or degree of force when the subject cannot evade custody, troopers such as Sollie would violate the constitutional rights of civilians such as Kevin Cobbins.

> **D.      Richards, Marie, Davis, and Riles Failed to Properly Employ the UOF Review Process to Supervise Defendant Sollie in the Constitutional Limits on the Use of Force.**

101.    LSP policy requires that a trooper must submit a Use of Force Report when, among other situations, the trooper discharges a Taser for a purpose other than training, or if the Taser or one of its probes comes into contact with another person, regardless of whether there is an injury involved. UOF Reports must also be submitted when a trooper applies deadly or non-deadly force or takes any action that results in, or is alleged to have resulted in, injury or death of another person.

102.    LSP supervisors such as Riles are required to review a UOF Report submitted by a trooper under their supervision, and as a result of the review, indicate whether actions taken by the trooper complied with LSP policy, procedure, and training. Thus, UOF reports submitted by Sollie during his assignment to Troop L would be submitted to Sollie's Sergeant and then to Riles.

103.    LSP policy further requires that the commander of a trooper who has submitted a UOF Report must tender that report, with the commander's assessment, to the LSP Training

22

Academy. LSP's Training Academy Director must review these UOF Reports to determine whether:

        a.     LSP rules, regulations, or policies have been violated;

        b.     The relevant policy was clearly understandable and effective to cover the situation; and

        c.     LSP training is currently adequate.

104.    Also, both the reporting trooper's commander and the Training Academy Director are required to determine whether the reporting trooper requires remedial training to align that trooper's UOF practices with LSP policy and training.

105.    The review of UOF Reports is an important part of the supervision of law enforcement officers. Such review helps to identify improper tactics, departures from policy and training, and emerging trends that require remediation, discipline, or amendments to policy and training.

106.    When supervisory officials tasked with reviewing UOF Reports fail to perform this function properly, potentially harmful behavior goes undetected and is allowed to continue without correction. At worst, the failure to identify and correct excessive uses of force, or even to approve of excessive uses of force, gives the reporting officer permission to continue to use excessive force in future encounters with civilians.

107.    Kevin Cobbins was not the first civilian against whom Sollie had deployed his Taser. Review of LSP's 2018 UOF Reports indicates that during at least two occasions that year, Sollie's use of his Taser was reported and subject to review by Riles, Davis, and Richards:

        a.     On July 1, 2018, Sollie and another trooper sought to stop a Black man who was riding a moped without wearing a helmet. Sollie pursued the subject, and saw

him discard a firearm in tall grass. During the pursuit, Sollie discharged his Taser and the subject was apprehended. At the time Defendant Sollie was pursuing the subject, the only known offense was the failure to wear a helmet on a moped. Sollie reported that the subject was not actively resisting arrest or seizure by force. Richards and Davis approved Sollie's use of force on this subject. Although Riles was the commander of Troop L, to which Sollie was assigned, Riles did not review or approve the UOF Report.

b.      On August 25, 2018, Sollie and another trooper conducted a traffic stop of a Black man driving a motorcycle with no license plate. The driver dropped the motorcycle to the ground and began to run. Again, during Sollie's pursuit on foot, he deployed his Taser and the subject fell to the ground. Sollie reported that the subject was not actively resisting arrest or seizure by force. Richards and Davis approved Sollie's use of force on this subject. Although Defendant Riles was the commander of Troop L, to which Sollie was assigned, Riles did not review or approve the UOF Report.

108.    Three other UOF incidents were reported by Sollie in 2018; these were also subject to review by Riles, Davis, and Richards:

a.  On May 4, 2018, Sollie responded to a call regarding a stolen car, and responded by conducting a maneuver to strike the allegedly stolen car with Sollie's vehicle and placing the Black man behind the wheel under arrest. This incident took place at the corner of Canal and S. Dorgenois Streets at 4 p.m. on a Friday during Jazz Fest. Sollie reported that the subject was not actively resisting arrest or seizure by

24

force. The UOF Report reflects that only Sollie's direct supervisor, Chad Lacoste, reviewed and approved Sollie's action on this occasion.

b.  On May 24, 2018, Sollie and another trooper stopped a car driven by a Black man for a window tint violation. The driver was told to exit the vehicle; however, the driver put a piece of paper outside the window and stated "I didn't do anything wrong." The other trooper had difficulty extracting the driver from the vehicle. Sollie performed an arm bar take-down on the driver, and pinned him with a rear mount position. In his UOF Report as submitted, Sollie reported that the subject was not actively resisting arrest or seizure by force. However, Davis rejected the UOF Report and directed Sollie as follows: "In the "Additional Details" section please change 'Did the subject actively resist arrest/seizure by force:' from no to yes." When the UOF Report was re-submitted, Richards and Davis approved Sollie's use of force on this subject. Although Riles was the commander of Troop L, to which Sollie was assigned, Riles did not review or approve the UOF report.

c.   On August 1, 2018, Defendant Sollie and another trooper stopped a car for "slow rolling" down the street. The subject, a Black man, was a passenger in the car. The passenger began to roll up his window. Sollie reported that the subject was not actively resisting arrest or seizure by force. Sollie opened the passenger door to remove the subject, and saw a firearm on the subject's lap. Sollie then used the arm bar technique to remove the subject from the car. Richards and Davis approved Sollie's use of force on this subject. Although Riles was the commander of Troop L, to which Sollie was assigned, Riles did not review or approve the UOF report.

109.    As Troop L commander, Riles was responsible for reviewing Use of Force Reports and ensuring that Sollie received training and discipline if necessary to prevent future uses of force in a manner contrary to the Fourth and Fourteenth Amendments to the Constitution, as well as LSP policy and training.

110.    As Training Director and Use of Force Instructor, Richards and Davis were responsible for reviewing UOF Reports and ensuring that Sollie received training and discipline if necessary to prevent future uses of force in a manner contrary to the Fourth and Fourteenth Amendments to the Constitution, as well as LSP policy and training.

111.    Riles, Richards, and Davis repeatedly failed to train or supervise Sollie each time Sollie submitted a Use of Force Report which indicated that he had violated the Fourth and Fourteenth Amendments and used excessive force against civilians.

112.    A known and obvious consequence of the repeated failure of Riles, Richards, and Davis to retrain or discipline Sollie was that Sollie would continue to use excessive force in a manner contrary to the Fourth and Fourteenth Amendments to the Constitution so as to cause harm to civilians such as Kevin Cobbins.

E.    **Richards, Marie, and Davis Failed to Train Troopers Regarding Their Duty to Intervene to Stop Another Law Enforcement Officer from Violating a Civilian's Constitutional Rights.**

113.    In addition to the failures of training set forth above, Richards, Marie, and Davis also failed to train troopers such as Sollie on the duty of bystander officers to intervene to prevent or stop a constitutional violation committed by another law enforcement officer in the trooper's presence.

114.    As of March 12, 2020, the clearly established interpretation of the Fourth and Fourteenth Amendments by the U.S. Court of Appeals for the Fifth Circuit included that a law

enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer in the trooper's presence.

115.    That same clearly established interpretation of the Constitution by the Fifth Circuit requires the bystander officer to intervene to prevent or stop a constitutional violation even if the officers committing the violation are from a different law enforcement agency than the bystander officer.

116.    Despite the fact that the constitutional duty of a bystander officer to intervene to prevent or stop a constitutional violation by another law enforcement officer has been clearly established in the Fifth Circuit since at least 1995, Richards, Marie, and Davis failed to train cadets or in-service troopers about this duty.

117.    It was obvious that, as a likely consequence of the failure by Richards, Marie, and Davis to train in-service troopers on the constitutional duty of a bystander officer to intervene to prevent or stop a constitutional violation by another law enforcement officer, troopers such as Sollie would fail to intervene to prevent or stop officers such as Graham, Mott, Shaw, Harkins, and Glenn from violate the constitutional rights of civilians such as Kevin Cobbins.

### III.    Reeves Failed to Establish Policies to Protect Civilians, Particularly Black Men, from Excessive Force.

118.    Reeves had been appointed as Superintendent of LSP in March 2017. As Superintendent, Reeves was responsible for the supervision, administration, policies, practices, customs, operations, training, staffing, and operation of the LSP.

119.    Reeves retired from LSP effective October 30, 2020.

120.    Reeves' tenure as Superintendent was clouded with accusations of unconstitutional policing directed at Black men and the shielding of troopers who were close associates of Reeves from accountability for misconduct against Black civilians.

121.    Thus, in October 2020, the NAACP called for Reeves' resignation over at least two incidents: (1) a trooper who called a co-worker a racial slur and was never disciplined, and (2) the 2019 death of Ronald Greene following a pursuit (and physical assault) by LSP.

122.    Greene died in May 2019 after a pursuit by LSP following Greene's alleged failure to stop for an unspecified traffic violation. LSP initially claimed Greene died after crashing into a tree but it was later discovered that there was a "struggle" with LSP troopers prior to Greene's death.

123.    The civil suit filed by Greene's family alleges the troopers pinned Greene to the ground and used a stun gun on him. A leaked audio recording of Trooper Chris Hollingsworth revealed these statements as to Hollingsworth's actions against Greene: "I beat the ever living f*** out of him." "Choked him and everything else to get him under control." "He was spitting blood everywhere, and all of a sudden he went limp."

124.    Counsel for Mr. Greene's surviving family members have stated that "[i]t was not until public pressure around [Greene's] death mounted more than a year later that the truth came out, which means that either Colonel Reeves knew of this conspiracy to protect the troopers involved in Mr. Greene's murder and allowed it to continue, or that his own troopers did not respect him enough to tell him what really happened."

125.    The allegations regarding Greene's death in 2019 include elements of the assault on Kevin Cobbins by Sollie in March 2020: the use of force against a Black man disproportionate to the reason for the stop; the failure to deescalate the force used after the subject was on the ground and unable to escape custody; the use of physical blows and the Taser, particularly deployment of its "stun" mechanism; and the failure of any of the officers at the scene to intervene to prevent or stop the excessive force which caused Greene's death.

126.     Reeves is responsible for the culture of brutality and silence that permeated LSP during his tenure as Superintendent, as reflected in the cadet training program, the failures to enact policies and provide training to ensure that troopers adhere to the Fourth Amendment's prohibition against the use of excessive force, and the failures to enact policies and provide training that ensure that troopers who are present and witness the unconstitutional actions of other law enforcement officers (including fellow troopers) intervene to prevent or stop the violation of civilians' constitutional rights.

127.     Reeves had final authority over the creation and modification of LSP policies and procedures. As such, he is responsible for the failure of LSP policy, custom, training, supervision, or practice to require troopers such as Defendant Sollie to follow the clearly established interpretation of the Fourth and Fourteenth Amendments:

  a.  that a law enforcement officer can only use that amount or degree of force that is necessary, reasonable, and proportional to the circumstances;

  b.  that the level of force must be proportionately reduced where a civilian lacks any means of evading custody, including, for example, when the civilian is pinned to the ground by other officers; and

  c.  that even where a civilian pinned down by law enforcement officers is failing to comply with the officers' directions, and struggling against the officers at certain points throughout the encounter, the use of force may not be escalated.

128.     Reeves also failed to establish policies, customs, training, supervision, or practices to require troopers such as Sollie to follow the clearly established interpretation of the Fourth and Fourteenth Amendments that a law enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer in the trooper's presence.

129.    Contrary to the duty to intervene, Reeves maintained the culture of silence and protection of troopers against accountability for violence against Black civilians. The same week as the announcement of Reeves' retirement, it also came to light that Jacob Brown, an LSP employee and son of another LSP ranking officer who worked closely with Reeves, was placed on leave for excessive force in 2019. Brown resigned March 12, 2021, after being recently arrested in three separate excessive force incidents – in at least two incidents, Brown is accused of using excessive force against Black civilians during traffic stops.

130.    It was obvious that, as a likely consequence of the failure of Reeves to establish policies, customs, training, supervision, or practices to direct LSP troopers to adhere to (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, troopers such as Sollie would violate the constitutional rights of civilians such as Kevin Cobbins.

**IV.    The Policy, Training, and Supervision Failures by Sheriff Edwards Resulted in Excessive Force Against Kevin Cobbins and Failure to Intervene.**

131.    As Sheriff of Tangipahoa Parish, Edwards had a duty to establish policies, customs, and practices to ensure that the deputies under his command respected the constitutional rights of the civilians with whom such deputies had contact – even if such civilians were suspected of a crime.

132.    Further, Edwards had a duty to supervise and train the deputies under his command to respect the constitutional rights of the civilians with whom such deputies had contact – even if such civilians were suspected of a crime.

133.    Defendant Edwards failed to establish a Use of Force policy, custom, or practice which would require deputies such as Graham, Mott, Shaw, Harkins, and Glenn to follow the clearly established interpretation of the Fourth and Fourteenth Amendments:

    a.    that a law enforcement officer can only use that amount or degree of force that is necessary, reasonable, and proportional to the circumstances;

    b.    that the level of force must be proportionately reduced where a civilian lacks any means of evading custody, including, for example, when the civilian is pinned to the ground by other officers; and

    c.    that even where a civilian pinned down by law enforcement officers is failing to comply with the officers' directions, and struggling against the officers at certain points throughout the encounter, the use of force may not be escalated.

134.    Edwards also failed to establish policies, customs, or practices to require deputies such as Graham, Mott, Shaw, Harkins, and Glenn to follow the clearly established interpretation of the Fourth and Fourteenth Amendments that a law enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer in the trooper's presence.

135.    It was obvious that, as a likely consequence of the failure of Edwards to establish policies, customs, or practices to direct TPSO deputies to adhere to (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, deputies such as Graham, Mott, Shaw, Harkins, and Glenn would violate the constitutional rights of civilians such as Kevin Cobbins.

136.    Edwards failed to establish training programs or policies, or to require a subordinate to establish training programs or policies, to educate and train deputies such as Graham, Mott, Shaw, Harkins, and Glenn in (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

137.    Further, Edwards failed to supervise and/or discipline, or to create policies or systems of supervision and/or discipline, that would prevent the officers under his command from using excessive force or failing to intervene to prevent or stop other officers from using excessive force.

138.    It was obvious that, as a likely consequence of the failure by Defendant Edwards to train TPSO deputies on the constitutional requirement to use only that amount or degree of force necessary, reasonable, and proportional to the circumstances, deputies such as Graham, Mott, Shaw, Harkins, and Glenn would violate the constitutional rights of civilians such as Kevin Cobbins.

139.    It was obvious that, as a likely consequence of the failure by Edwards to train TPSO deputies on the constitutional duty of a bystander officer to intervene to prevent or stop a constitutional violation by another law enforcement officer, deputies such as Graham, Mott, Shaw, Harkins, and Glenn would fail to intervene to prevent or stop each other, or Sollie, from violating the constitutional rights of civilians such as Kevin Cobbins.

140.    It was obvious that, as a likely consequence of the failure by Edwards to supervise and/or discipline, or to create policies or systems of supervision and/or discipline, that would prevent the officers under his command from using excessive force or failing to intervene to

prevent or stop other officers from using excessive force, deputies such as Graham, Mott, Shaw, Harkins, and Glenn would violate the constitutional rights of civilians such as Kevin Cobbins and would fail to intervene to prevent or stop each other, or Sollie, from violating the constitutional rights of civilians such as Kevin Cobbins.

## CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT'S PROHIBITION ON EXCESSIVE FORCE, PURSUANT TO 42 U.S.C. § 1983

### (GRAHAM, SOLLIE, MOTT, SHAW, HARKINS, AND GLENN)

141.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

142.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn used unnecessary, unreasonable, and excessive force against Kevin Cobbins, depriving Cobbins of rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution.

143.    At all times, Graham, Sollie, Mott, Shaw, Harkins, and Glenn were acting under color of law and was aware that uses of force without justification and/or legal cause are unlawful.

144.    As a result of the unnecessary, unreasonable, and excessive force used by Graham, Sollie, Mott, Shaw, Harkins, and Glenn, Kevin Cobbins suffered injury and damage.

145.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn, in their individual capacities, are liable to Cobbins for violation of his Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.

## COUNT TWO

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT'S PROHIBITION ON FAILURE TO INTERVENE (BYSTANDER LIABILITY), PURSUANT TO 42 U.S.C. § 1983

### (GRAHAM, SOLLIE, MOTT, SHAW, HARKINS, AND GLENN)

146.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

147.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn were each present at the scene of the use of excessive force against Cobbins and did not take reasonable measure to protect Cobbins from the other officers' use of excessive force.

148.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn each realized the excessive nature of the force and knew that the other officers were violating Cobbins' constitutional rights; each officer had a reasonable opportunity to prevent the harm; and each officer chose not to act.

149.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn each acquiesced in the use of excessive force by the other officers.

150.    As a result of failure of Defendants Graham, Sollie, Mott, Shaw, Harkins, and Glenn to intervene to prevent or stop the infliction of excessive force on him, Kevin Cobbins suffered injury and damage.

151.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn, in their individual capacities, are liable to Williams for violation of his Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.

## COUNT THREE

### FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE OFFICERS GRAHAM, MOTT, SHAW, HARKINS, AND GLENN PURSUANT TO 42 U.S.C. § 1983

### (EDWARDS, IN HIS INDIVIDUAL CAPACITY)

152.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

153.    Edwards, acting under color of law and in his individual capacity, violated Cobbins' Fourth and Fourteenth Amendment rights to be free from excessive force and the Fourth and Fourteenth Amendments' prohibition on an officer's failure to intervene.

154.    Edwards failed to train, supervise, and/or discipline his subordinates, namely Officers Graham, Mott, Shaw, Harkins, and Glenn, to ensure that these subordinates did not violate the Fourth and Fourteenth Amendment rights of the members of the public they encounter in their duties. Edwards also failed to train, supervise, and/or discipline Graham, Mott, Shaw, Harkins, and Glenn on the constitutional duty of a bystander officer to intervene to prevent or stop a constitutional violation by another law enforcement officer.

155.    These failures to train, supervise, and/or discipline were moving forces behind the excessive use of force against Cobbins as well as the failure to intervene. At all pertinent times herein, Edwards was aware of the need to supervise, train, and discipline his subordinates in order to ensure that they did not violate the rights of members of the public. Edwards ignored that need and acted unreasonably and with deliberate indifference and disregard for Kevin Cobbins' constitutional rights, as described above.

<u>**COUNT FOUR**</u>

**MONELL VIOLATION OF COBBINS' CIVIL RIGHTS
BASED ON THE FAILURE TO ESTABLISH POLICIES, CUSTOMS, OR PRACTICES,
THAT SUBJECTED MEMBERS OF THE PUBLIC TO EXCESSIVE USES OF FORCE
AND FAILURES TO INTERVENE,
PURSUANT TO 42 U.S.C. § 1983**

**(EDWARDS, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

156.    As a final policymaker for the Tangipahoa Parish Sheriff's Office, Edwards, in his individual and official capacity, violated Kevin Cobbins' constitutional rights by establishing and maintaining policies, customs, usages, practices, and/or procedures that he knew would deprive members of the public, including Kevin Cobbins, of their constitutional rights protected under the Fourth and Fourteenth Amendments.

157.    Further Edwards failed to establish and maintain policies to ensure constitutional police conduct, and Edwards knew or should have known that such failures would deprive members of the public, including Kevin Cobbins, of their constitutional rights under the Fourth and Fourteenth Amendments.

158.    In particular, Defendant Edwards failed to establish a Use of Force policy, custom, or practice which would require deputies such as Graham, Mott, Shaw, Harkins and Glenn to follow the clearly established interpretation of the Fourth and Fourteenth Amendments:

   a.    that a law enforcement officer can only use that amount or degree of force that is necessary, reasonable, and proportional to the circumstances;

   b.    that the level of force must be proportionately reduced where a civilian lacks any means of evading custody, including, for example, when the civilian is pinned to the ground by other officers; and

    c.    that even where a civilian pinned down by law enforcement officers is failing to comply with the officers' directions, and struggling against the officers at certain points throughout the encounter, the use of force may not be escalated.

159.    Edwards also failed to establish policies, customs, or practices to require deputies such as Graham, Mott, Shaw, Harkins, and Glenn to follow the clearly established interpretation of the Fourth and Fourteenth Amendments that a law enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer in the trooper's presence.

160.    These policies, customs, usages, practices, and/or procedures (or deficits thereof) were a moving force in the excessive use of force against Kevin Cobbins as well as the officers' failure to intervene. At all pertinent times herein, Edwards was aware that the policies, procedures, practices, customs, and/or usages he established (or failed to establish) for TPSO would result in violations of constitutional rights. Edwards ignored that risk and acted unreasonably and with deliberate indifference to Kevin Cobbins' constitutional rights, as described above.

161.    At all pertinent times, Edwards was acting under color of law and in the course and scope of his employment. Edwards acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Cobbins by failing to prevent the misconduct of officers under their command.

162.    As a result of Edwards' failures to implement policies, customs, and practices as set forth above, Kevin Cobbins suffered damage and harm.

## COUNT FIVE

### FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE TROOPER SOLLIE, PURSUANT TO 42 U.S.C. § 1983

### (REEVES, RILES, RICHARDS, MARIE, AND DAVIS, IN THEIR INDIVIDUAL CAPACITIES)

163.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

164.    Reeves, Riles, Richards, Marie, and Davis, acting under color of law and in their individual capacities, both individually and collectively, violated Cobbins' Fourth and Fourteenth Amendment rights to be free from excessive force and the Fourth and Fourteenth Amendments' prohibition on an officer's failure to intervene.

165.    Reeves, Riles, Richards, Marie, and Davis failed to train, supervise, and/or discipline their subordinates, namely Trooper Sollie, to ensure that this subordinate did not violate the Fourth and Fourteenth Amendment rights of the members of the public he encounters in his duties. This failure to train, supervise, and/or discipline was a moving force behind the excessive use of force against Cobbins as well as the failure to intervene. At all pertinent times herein, Reeves, Riles, Richards, Marie, and Davis were aware of the need to supervise, train, and discipline their subordinates in order to ensure that they did not violate the rights of members of the public. Reeves, Riles, Richards, Marie, and Davis ignored that need and acted unreasonably and with deliberate indifference and disregard for Kevin Cobbins' constitutional rights, as described above.

166.    As final policymakers for the Louisiana State Police, Reeves, Riles, Richards, Marie, and Davis, in their individual capacities, violated Kevin Cobbins' constitutional rights by establishing and maintaining policies, customs, usages, practices, and/or procedures that they knew

would deprive members of the public, including Kevin Cobbins, of their constitutional rights protected under the Fourth and Fourteenth Amendments.

167.    Further Reeves, Riles, Richards, Marie, and Davis failed to establish and maintain policies to ensure constitutional police conduct, and knew or should have known that such failures would deprive members of the public, including Kevin Cobbins, of their constitutional rights under the Fourth and Fourteenth Amendments.

168.    These policies, customs, usages, practices, and/or procedures (or deficits thereof) were a moving force in the excessive use of force against Kevin Cobbins as well as the officers' failure to intervene. At all pertinent times herein, Reeves, Riles, Richards, Marie, and Davis were aware that the policies, procedures, practices, customs, and/or usages they established (or failed to establish) for LSP would result in violations of constitutional rights. Reeves, Riles, Richards, Marie, and Davis ignored that risk and acted unreasonably and with deliberate indifference to Kevin Cobbins' constitutional rights, as described above.

169.    At all pertinent times, Reeves, Riles, Richards, Marie, and Davis were acting under color of law and in the course and scope of their employment. Reeves, Riles, Richards, and Davis acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Cobbins by failing to prevent the misconduct of troopers under their command.

<u>**COUNT SIX**</u>

**SUPPLEMENTAL STATE LAW CLAIM FOR ASSAULT AND BATTERY
RESULTING IN INJURY TO KEVIN COBBINS**

**(GRAHAM, SOLLIE, MOTT, SHAW, HARKINS, GLENN,
EDWARDS, REEVES, RILES, RICHARDS, MARIE, AND DAVIS)**

170.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

171.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn intended to inflict a harmful or offensive contact upon Cobbins in the process of seizing him by using excessive force. The seizure and detention of Cobbins was unjustified by legal authority. Thus, Graham, Sollie, Mott, Shaw, Harkins, and Glenn committed the intentional torts of assault and battery.

172.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn were acting under color of law and in the course and scope of their employment at all times relevant to this claim.

173.    As a direct and proximate result of these Defendants' misconduct, Cobbins suffered damages, including bodily injury, pain, suffering, severe mental and emotional distress, anguish, humiliation, loss of liberty, and loss of income, as set forth more fully above.

174.    Edwards is liable for the intentional torts committed by Officers Graham, Mott, Shaw, Harkins, and Glenn, as described in paragraph 171, under the doctrine of *respondeat superior* because he maintained the employ and was responsible for the supervision of these Defendant Officers. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

175.    Reeves, Riles, Richards, Marie, and Davis are liable for the intentional torts committed by Trooper Sollie, as described in paragraph 171, under the doctrine of *respondeat*

*superior* because they maintained the employ and were responsible for the supervision of this Defendant Trooper. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

176.    At all times pertinent herein, all Defendants names in this Count, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently toward Cobbins.

## COUNT SEVEN

### SUPPLEMENTAL STATE LAW CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS RESULTING IN INJURY TO KEVIN COBBINS

### (GRAHAM, SOLLIE, MOTT, SHAW, HARKINS, GLENN, EDWARDS, REEVES, RILES, RICHARDS, MARIE, AND DAVIS)

177.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

178.    The excessive use of force by Graham, Sollie, Mott, Shaw, Harkins, and Glenn against Cobbins was extreme and outrageous conduct that caused Cobbins severe emotional distress. Graham, Sollie, Mott, Shaw, Harkins, and Glenn each knew or should have known that such distress would be the outcome of his actions and therefore is liable for the intentional infliction of emotional distress. In the alternative, these Defendants are liable for negligent infliction of emotional distress.

179.    Graham, Sollie, Mott, Shaw, Harkins, and Glenn acting under color of law and in the course and scope of their employment at all times relevant to this claim.

180.    As a direct and proximate result of these Defendants' misconduct, Cobbins suffered damages, including bodily injury, pain, suffering, severe mental and emotional distress, anguish, humiliation, loss of liberty, and loss of income, as set forth more fully above.

181.    Edwards is liable for the intentional torts committed by Officers Graham, Mott, Shaw, Harkins, and Glenn, as described in paragraph 178, under the doctrine of *respondeat superior* because he maintained the employ and was responsible for the supervision of these Defendant Officers. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

182.    Reeves, Riles, Richards, Marie, and Davis are liable for the intentional torts committed by Trooper Sollie, as described in paragraph 178, under the doctrine of *respondeat superior* because they maintained the employ and were responsible for the supervision of this Defendant Trooper. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

183.    At all times pertinent herein, all Defendants names in this Count, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently toward Cobbins.

WHEREFORE, Plaintiff Kevin Cobbins requests that this Court enter judgment against Defendants and issue the following relief:

    a.   a declaratory judgment that Defendants violated Cobbins' constitutional rights;

    b.   a declaratory judgment that Defendants caused the assault and battery and intentional infliction of emotional distress on Cobbins;

    c.   an award of damages in an amount to be determined, including as available and proper, any nominal or punitive damages;

    d.   an order and judgment granting reasonable attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988; and

    e.   any relief that this Court deems just and proper.

Respectfully submitted,

/s/ James W. Craig
James W. Craig, La. Bar No. 33687, T.A.
Emily M. Washington, La. Bar No. 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macathurjustice.org

*Attorneys for Plaintiff Cobbins*